UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | EDCV 15-00107 JGB (DTBx) | Date | March 8, 2018 |
| Title | *Jacqueline Dean v. Colgate-Palmolive Co.* | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**   Order: (1) DENYING Plaintiffs' Motion for Class Certification (Dkt. No. 102); (2) GRANTING IN PART and DENYING IN PART Defendant's Application to File Documents Under Seal (Dkt. No. 110); (3) GRANTING Plaintiffs' Application to File Documents Under Seal (Dkt. No. 116); and (4) DENYING Defendant's Application to File Documents Under Seal as Moot (Dkt. No. 71)

    Before the Court is one motion and three applications to file documents under seal. Plaintiffs Jacqueline Dean ("Plaintiff Dean") and Melanie Barber ("Plaintiff Barber") (collectively, "Plaintiffs") filed a Motion for Class Certification on October 2, 2017.  ("Motion," Dkt. No. 102.)  Two applications to file documents under seal has been filed by Defendant Colgate-Palmolive Company ("Defendant") ("Defendant's Application 1," Dkt. No. 110; "Defendant's Application 2," Dkt. No. 71) and one by Plaintiffs ("Plaintiffs' Application," Dkt. No. 116).  The Court held a hearing on the Motion on January 29, 2018.  The parties separately filed supplemental briefs on February 2, 2018.  (Dkt. Nos. 122, 123.)

    After considering the documents filled in support of and in opposition to the Motion, and after considering the argument of counsel, the Court DENIES Plaintiffs' Motion.  Additionally, upon review of the documents sought to be sealed, the Court GRANTS IN PART and DENIES IN PART Defendant's Application 1 and GRANTS Plaintiffs' Application.  Finally, the Court DENIES Defendant's Application 2 as moot.

## I. BACKGROUND

On January 16, 2015, Plaintiffs filed a class action complaint against Defendant. ("Complaint," Dkt. No. 1.) Plaintiffs asserted five claims individually and on behalf of similarly situated individuals: (1) breach of express warranty; (2) breach of implied warranty of fitness for a particular purpose; (3) violation of the Consumer Legal Remedies Act ("CLRA"); (4) false advertising; and (5) violations of the Unlawful Competition Law ("UCL"). (Complaint ¶¶ 40–96.) The Complaint alleges Defendant "falsely represent[ed] that Colgate Optic White toothpaste ("Optic White") 'Goes Beyond Surface State Removal to Deeply Whiten,'" that Optic White "Deeply Whitens," and that the peroxide in Optic White is clinically proven to whiten and go beyond surface stain removal." (Id. ¶ 1.) Plaintiffs claim Optic White has not deeply whitened their teeth, or affected any of the intrinsic stains on their teeth. (Complaint ¶ 4.)

Defendant filed a Motion to Dismiss, Stay or Strike the Complaint on April 17, 2015. (Dkt. No. 28.) On June 17, 2015, the Court denied Defendant's motion. A Motion to Transfer Case to the Judicial Panel on Multidistrict Litigation ("JPML") was filed by a non-party on June 28, 2016. (Dkt. No 59.) Defendant subsequently filed a Motion to Stay the case pending a decision by the JPML. (Dkt. No. 62.) On August 18, 2016, the Court granted Defendant's Motion to Stay and stayed the case. (Dkt. No. 67.)

On October 14, 2016, following the JPML's denial of the Motion to Transfer the case, the parties filed a Joint Report. (Dkt. No. 68.) The parties then stipulated to a briefing schedule for the Motion for Class Certification. (Dkt. No. 69.) The Court approved the stipulation and the modified briefing schedule on December 27, 2016. (Dkt. No. 70.)

On May 23, 2017, Plaintiffs filed their First Amended Complaint against Defendant. ("FAC," Dkt. No. 92.) On October 2, 2017, Plaintiffs filed the instant Motion. Defendant filed an opposition on November 16, 2017 ("Opposition," Dkt. No. 111), and filed Defendant's Application 1. Plaintiffs filed a reply on December 14, 2017 ("Reply," Dkt. No. 118), and filed Plaintiffs' Application.

## II. APPLICATION FOR LEAVE TO FILE DOCUMENTS UNDER SEAL

Both parties rely on the Stipulated Protective Order, pursuant to which the parties agreed certain discovery information could be designated as "Confidential." (Dkt. No. 38 ¶¶ 3–5.) Pursuant to Central District Local Rule 79-5.2.2, in a non-sealed civil case where a party has designated documents confidential pursuant to a protective order, the parties must meet and confer at least 3 days before "in an attempt to eliminate or minimize the need for filing under seal by means of redaction." L.R. 79-5.2.2(b). If the parties cannot agree on suitable redactions, the filing party must include a supporting declaration describing the meet and confer efforts. Id. The designating party must then file a declaration "establishing that all or part of the designated material is sealable . . . with citations to the applicable legal standard." L.R. 79-5.2.2(b)(i). A review of the documents filed in connection to the applications demonstrate the parties have

adhered to the procedural requirements of the Local Rules. The Court thus turns to whether the documents are sealable under applicable law.

There is a strong presumption of public access to judicial records and documents. Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 n.7 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."); Pintos v. Pac. Creditors Ass'n, 605 F.3d 665, 677 (9th Cir. 2010). The presumption applies to pleadings filed with the court and extends to discovery material attached to those pleadings. Foltz v. State Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1134 (9th Cir. 2003). Although a request to seal judicial records offends the presumption in favor of public access, the right of access "is not absolute." Id. at 1135.

Generally, two standards govern requests to seal documents: the "compelling reasons" standard and the "good cause" standard. Pintos, 605 F.3d 665 at 677. A party that seeks to seal judicial records relating to a dispositive motion must overcome the strong presumption of public access by satisfying the compelling reasons standard. Kamakana v. City and Cty of Honolulu, 447 F.3d 1172, 1178 (9th Cir. 2006). "That is, the party must articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure." Id. at 1178–79 (internal citation of quotation marks omitted). "[C]ompelling reasons sufficient to outweigh the public's interest in disclosure and justify the sealing of court records exist when such court files might have become a vehicle for improper purposes, such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." Id. (citing Nixon, 435 U.S. at 598). However, "[t]he mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." Id. (citing Foltz, 331 F.3d at 1136).

While the presumption is the starting point of a court's analysis for dispositive motions, the presumption does not apply to non-dispositive motions. Id. at 1179; see also Pintos, 565 F.3d at 678–79. "[T]he public has less of a need for access to court records attached only to non-dispositive motions because those documents are often unrelated, or only tangentially related, to the underlying cause of action." Kamakana, 447 F.3d at 1179 (internal citation omitted). Thus, a party moving to seal judicial records need only meet the good cause standard. Foltz, 331 F.3d at 1135; Phillips ex rel. Estates of Byrd v. General Motors Corp., 307 F.3d 1206, 1213 (9th Cir. 2002).

The good cause standard, defined by Federal Rule of Civil Procedure 26(c), is the same good cause standard that applies to the entry of a protective order: "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." Fed. R. Civ. P. 26(c). Pursuant to the good cause standard, a court must determine whether "good cause exists to protect th[e] information from being disclosed to the public by balancing the needs for discovery against the need for confidentiality." Pintos, 605 F.3d at 678 (internal citation and quotation marks omitted). Notably, only a particularized showing of good cause satisfies the standard. Kamakana, 447 F.3d at 1180. A

blanket protective order on its own is insufficient to establish good cause for purposes of an application to seal. Foltz, 331 F.3d at 1133.

A motion for class certification is a non-dispositive motion. See Switzer v. Thomas, No. 5:12CV00056, 2013 WL 1145864, at *1 (W.D. Va. Mar. 19, 2013). Accordingly, the parties need only demonstrate that good cause exists to protect the information from being disclosed to the public. See Kamakana, 447 F.3d at 1179. These documents are the subject of Defendant's Application 2:

1. The portions of the unredacted version of Colgate's Opposition to Plaintiffs' Motion for Class Certification that refer to Defendant's confidential research, development, or commercial information.

2. The portions of the unredacted version of the Declaration of Rita Gallagher that refer to Defendant's confidential research, development, or commercial information.

3. The portions of the unredacted version of the Declaration of William DeVizio that refer to Defendant's confidential research, development, or commercial information.

4. The portions of the unredacted version of the Declaration of Jill Holder that refer to Defendant's confidential research, development, or commercial information.

5. The portions of the unredacted version of the Declaration of Peter Ross that refer to Defendant's confidential research, development, or commercial information.

6. The portions of the unredacted version of the Declaration of Mark Wolff that refer to Defendant's confidential research, development, or commercial information.

7. The portions of Exhibit 10 to the Declaration of Robyn E. Bladow that refer to Defendant's confidential research, development, or commercial information.

8. Exhibits 1–15 to the Declaration of William DeVizio in their entirety.

9. Exhibit 4 to the Declaration of Jill Holder in its entirety.

10. Exhibit 5 to the Declaration of Rita Gallagher in its entirety.

11. Exhibit 6 to the Declaration of Rita Gallagher in its entirety.

(Defendant's Application 2 at 1–3.) After reviewing the documents, the Court agrees these exhibits contain confidential information and good cause exists for sealing them. These documents contain or refer to information regarding Defendant's sales, research, or development practices.

Defendant also requested the Court seal three documents which Plaintiffs designated as confidential. (Id. at 4.) These documents are (1) portions of Exhibit 2 to the Declaration of

Robyn Bladow, (2) Exhibit 7 to the Declaration of Robyn Bladow in its entirety, (8) Exhibit 8 to the Declaration of Robyn Bladow in its entirety. After reviewing these documents, the Court finds them unrelated to Defendant's sales, research, or development practices. Defendant does not proffer a reason for these documents to be sealed. Thus, Defendant's Application 2 is DENIED with respect to these documents. Plaintiffs also seek to file documents under seal. These documents are the subject of Plaintiffs' Application:

1. Portions of the Reply Declaration of Jacqueline Dean in Support of Motion for Class Certification ("Dean Declaration") which reference information Plaintiffs designated as confidential.

2. Portions of Exhibit 1 to the Dean Declaration which contains information Plaintiffs designated as confidential.

3. The Reply Declaration of Colin Weir in Support of Motion for Class Certification ("Weir Reply Declaration") which contains information Defendant designated as confidential.

4. The Reply Declaration of J. Michael Dennis, Ph.D. in Support of Motion for Class Certification ("Dennis Reply Declaration") which contains information Defendant designated as confidential.

5. Exhibit C to the Reply Declaration of L. Timothy Fisher in Support of Motion for Class Certification (the "Fisher Reply Declaration") which contains information Defendant designated as confidential.

6. Exhibit E to the Fisher Reply Declaration which contains information sensitive to Defendant.

7. Exhibit F to the Fisher Reply Declaration which contains information sensitive to Defendant.

8. Portions of Plaintiffs' Reply in Support of Motion for Class Certification ("Reply") which reference information Plaintiffs and Defendant previously designated as confidential.

(Plaintiffs' Application at 1–3.) The redacted portions of Plaintiffs' Reply, Dean Declaration, and Exhibit 1 to the Dean Declaration contain details relating to Plaintiff Dean's private medical history, past legal proceedings, and financials. (Id. at 3.) This information has been previously designated confidential (id.) and could potentially subject Plaintiff Dean to "annoyance, embarrassment, oppression, or undue burden." Fed. R. Civ. P. 26(c)(1)(G). Plaintiffs state the Weir Reply Declaration, the Dennis Reply Declaration, Exhibits C, E, and F to the Fisher Reply Declaration, and certain portions of Plaintiffs' Reply concern Defendant's trade secrets and proprietary price and business information and are thus appropriate for sealing. The Court agrees. Accordingly, finding good cause exists as to the above documents, the Court GRANTS Plaintiffs' Application in its entirety.

### III.  MOTION FOR CLASS CERTIFICATION

**A.  Legal Standard**

Federal Rule of Civil Procedure 23 ("Rule 23") governs the litigation of class actions.  A party seeking class certification must demonstrate the following prerequisites: "(1) numerosity of plaintiffs; (2) common questions of law or fact predominate; (3) the named plaintiff's claims and defenses are typical; and (4) the named plaintiff can adequately protect the interests of the class."  Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (citing Fed. R. Civ. P. 23(a)).  The party may not rest on mere allegations; it must provide facts to satisfy those requirements.  See Doninger v. Pac. Nw. Bell, Inc., 564 F.2d 1304, 1309 (9th Cir. 1977) (citing Gillibeau v. Richmond, 417 F.2d 426, 432 (9th Cir. 1969)).  Although not mentioned in Rule 23(a), the party seeking certification must also demonstrate that the class is ascertainable.  See Keegan v. Am. Honda Motor Co., Inc., 284 F.R.D. 504, 521 (C.D. Cal. 2012).

After satisfying the five prerequisites of numerosity, commonality, typicality, adequacy, and ascertainability, a party must also demonstrate one of the following: (a) a risk that separate actions would create incompatible standards of conduct for the defendant or prejudice individual class members not parties to the action; (b) the defendant has treated the members of the class as a class, making appropriate injunctive or declaratory relief with respect to the class as a whole; or (c) common questions of law or fact predominate over questions affecting individual members and that a class action is a superior method for fairly and efficiently adjudicating the action.  See Fed. R. Civ. P. 23(b)(1)-(3).

A trial court has broad discretion regarding whether to grant a motion for class certification.  See Bateman v. Am. Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010).  However, a party seeking class certification must affirmatively demonstrate compliance with Rule 23—that is, the party must be prepared to prove that there are in fact sufficiently numerous parties and common questions of law or fact.  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 347 (2011).  A district court must conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim."  Id.

Here, Plaintiffs propose a class they define as follows:  All persons in California, Delaware, the District of Columbia, Kansas, Missouri, New Jersey, Ohio, Utah, Virginia and West Virginia who purchased Optic White[1] on or after October 1, 2013, or who purchased Optic White Platinum[2] on or after February 1, 2014. (Motion at 1.)

---

[1] The Optic White toothpaste at issue includes Sparkling White, Icy Fresh, Enamel White, Sparking Mint, and Cool Mild Mint.

[2] The Optic White Platinum toothpaste at issue includes White & Radiant (formerly known as Optic White Platinum Whiten & Protect), and Lasting White (formerly known as Optic White Platinum Whiten & Protect).

### B. Ascertainability

"In addition to the explicit requirements of Rule 23, an implied prerequisite to class certification is that the class must be sufficiently definite; the party seeking certification must demonstrate that an identifiable and ascertainable class exists." Xavier v. Philip Morris USA Inc., 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011); see also Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc., 209 F.R.D. 159, 163 (C.D. Cal. 2002) ("Once an ascertainable and identifiable class has been defined, plaintiffs must show that they meet the four requirements of Rule 23(a), and the two requirements of Rule 23(b)(3)."). "Courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed." Schwartz v. Upper Deck Co., 183 F.R.D. 672, 679-80 (S.D. Cal. 1999). A class is ascertainable if it is "administratively feasible for the court to determine whether a particular individual is a member" using objective criteria. Keegan, 284 F.R.D. at 521 (citation omitted). "[A] lack of ascertainability alone will generally not scuttle class certification." Red v. Kraft Foods, No. CV 10-1028-GW (AGRx), 2012 WL 8019257, at *6 (C.D. Cal. Apr. 12 , 2012).

Here, the proposed class includes individuals across ten jurisdictions who purchased Optic White labeled with the representations at issue after October 1, 2013. (Motion at 23.) This definition provides sufficient information for a prospective class member to determine whether they meet the class characteristic. McCrary v. Elations Co., LLC, No. EDCV 13-00242 JGB OP, 2014 WL 1779243, at *8 (C.D. Cal. Jan. 13, 2014). While individuals may make false claims of membership, thorough notice and claims administration procedures may minimize any consumer confusion or fraud. See id. at 8 ("sufficient notice can cure confusion"); Forcellati v. Hyland's, Inc., No. CV 12-1983-GHK MRWX, 2014 WL 1410264, at *7 (C.D. Cal. Apr. 9, 2014) (explaining that doing a fraud analysis during the claims administration process can screen out bad claims). Defendant does not dispute this requirement, and the Court finds the proposed class ascertainable.

### C. Numerosity

A class satisfies the prerequisite of numerosity if it is so large that joinder of all class members is impracticable. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). To be impracticable, joinder must be difficult or inconvenient but need not be impossible. Keegan v. American Honda Motor Co., 284 F.R.D. 504, 522 (C.D. Cal. 2012). There is no numerical cutoff for sufficient numerosity. Id. However, forty or more members will generally satisfy the numerosity requirement. Id. Here, the proposed class will certainly include more than forty members, and Colgate does not dispute numerosity. Thus, the Court is satisfied this prong is met.

### D. Commonality

The commonality requirement is satisfied when plaintiffs assert claims that "depend upon a common contention . . . capable of classwide resolution—which means that a

determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc., 564 U.S. at 350.

Plaintiffs state the common contention in this case is whether "Optic White is effective for deeply whitening teeth." (Motion at 6.) Plaintiffs assert common evidence will show Defendant's products are ineffective for deep whitening. (Motion at 5.) They argue toothpaste does not whiten intrinsic stains because peroxide is not in contact with consumers' teeth for the requisite length of time, and because toothpaste does not contain sufficient peroxide to deeply whiten teeth. (Id.) As evidence for this argument, Plaintiffs rely heavily on a letter written from Procter and Gamble ("P&G"), Colgate's competitor, to the Federal Trade Commission ("FTC"). ("P&G Letter," Dkt. 102-3, Exh. 101 at 764–67). The letter was written to alert the FTC to Colgate's potentially overaggressive claims. (Id. at 764.) In relevant part, the letter states:

> Tooth color is affected by stains that are *extrinsic* or *intrinsic* to the surface of the teeth. "Extrinsic staining" . . . can typically be removed by mechanical means (e.g., by dental polishing or by the abrasive ingredients found in many toothpastes). "Intrinsic staining" is in the tooth enamel, and can only be removed by chemical action like that provided by certain peroxide whitening agents.
>
> To enable peroxide to intrinsically whiten teeth, it must be (1) held in sustained contact with the tooth surface for an extended period of time and be (2) protected from saliva. As Colgate itself acknowledges, saliva contains a high level of the enzyme catalase, which rapidly converts peroxide into gaseous oxygen and water, even as salivary flows wash away the peroxide. These decomposition and dilution effects are well documented in peer review literature and have been publicly accepted by Colgate's scientists and engineers. Clinical research has also proven the point. . . . Optic White has a very low concentration of peroxide, remains in the vicinity of the tooth surface for a very short period of time (typically, 2 minutes or less per brushing), over time provides much less aggregate exposure of peroxide to the tooth surface (whitening efficiency), and lacks a barrier to protect against the effects of saliva.

(Id. at 764–65.) P&G also conducted several clinical studies which found Optic White did not provide an intrinsic whitening benefit. (Motion at 6.) Plaintiffs then argue that Defendant might dispute the conclusion of P&G's studies, but disputing the conclusion does not disturb the fact that a common issue of fact predominates. (Id.) Plaintiffs believe a determination of the truth or falsity of Colgate's deep whitening claims will resolve a central issue to the validity of each claim in one stroke. (Id.)

For its part, Defendant contends Plaintiffs have not met their evidentiary burden. (Opposition at 16.) Defendant believes Plaintiffs must produce either "an admissible expert opinion or other competent evidence" in order to win a motion for class certification. (Id.) In support of this position, Defendant cites Supreme Court precedent which states that "[a] party

seeking class certification must . . . be prepared to prove that there are *in fact* . . . common questions of law or fact." Dukes, 564 U.S. at 350 (2011) (emphasis in original). Defendant attempts to minimize Plaintiffs' proffered clinical studies by emphasizing they were created by Defendant's competitor. (Opposition at 16.) While Plaintiffs' proffered study suffers from credibility questions, class certification is an inappropriate stage to adjudicate them. Here, Plaintiffs must only assert a question central to the validity of all individual claims. Defendant, for good reason, disputes the credibility and reliability of Plaintiffs' proffered clinical studies. However, Defendant has not provided the Court with authority that holds that Plaintiffs must offer stronger evidence than what they tendered here. Plaintiffs sufficiently raise a common question, and Defendant's disagreement with the answer does not negate its existence. Defendant implicitly acknowledges this fact, writing that Plaintiffs must show "that if this Court certifies a class, they will have competent, reliable evidence to present to the trier of fact that, *if credited*, could prove on a classwide basis that Optic White is ineffective for everyone." (Id. (emphasis added).) The study presented by Plaintiffs, if credited by the trier of fact, would prove Optic White's inability to whiten anyone's teeth. This is sufficient at the class certification stage.

### E. Typicality

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiff, and whether other class members have been injured by the same course of conduct." Wolin v. Jaguar Land Rover N. Am., 617 F.3d 1168, 1175 (9th Cir. 2010). Typicality is a permissive standard. Hanlon, 150 F.3d at 1020. The claims of the named plaintiff need not be identical to those of the other class members. Alonzo v. Maximus, Inc., 275 F.R.D. 513, 523 (C.D. Cal. 2011).

Defendant vigorously argues Plaintiffs failed to show typicality. Plaintiffs concede they must prove they relied on Colgate's representations in order to proceed with their claims (Motion at 19), and Defendant argues the Named Plaintiffs unique circumstances prevent them from being able to establish that reliance, rendering them atypical (Opposition at 8).

#### 1. Plaintiff Dean

Defendant notes Plaintiff Dean originally stated she first purchased Optic White in January 2013, which would defeat her claim of reliance as Defendant did not start using the Deeply Whitens label until late 2013. (Opposition at 8.) Once the timing of the label's first use was revealed in discovery, Plaintiff Dean amended her testimony, stating she began using Optic White in January 2014. ("Dean Deposition," Bladow Declaration Exh. 2, Dkt No. 71-3 at 64:17–66:24.) Defendant then points out Plaintiff Dean testified she initially purchased the product after viewing a specific commercial which promoted the "Deeply Whitens" representations. However, that commercial didn't begin airing until March 2014, two months after when Plaintiff Dean alleges she first purchased the product. (Opposition at 9, citing Dean Deposition 90:25–91:21.) Finally, Defendant argues Plaintiff Dean's unique medical dental history will divert the focus of the litigation, rendering her atypical.

Plaintiffs argue Plaintiff Dean's "imperfect recollection" of her purchase is insufficient to defeat reliance, standing, or typicality. (Reply at 1, citing Ries v. Arizona Beverages USA LLC, 287 F.R.D. 523, 530 (N.D. Cal. 2012) ("[D]efendants may attempt to exploit plaintiffs' imperfect recollections to persuade the trier of fact to discount their testimony, but critically, because plaintiffs specifically recall defendants' representations . . . and indicate that statement was material to their purchase, this standing requirement is satisfied").) Plaintiff Dean has consistently stated she relied on the misrepresentation before she made her purchase (Reply at 2), and the Court finds her equivocal statements do not defeat typicality. As for her unique medical history, Defendant admits Plaintiff Dean only expected the product to whiten her natural teeth. (Opposition at 10.) The number of teeth the product would have whitened is inconsequential compared to whether the product can whiten any teeth. Consequently, the Court finds Plaintiff Dean appropriately typical of the proposed class.

### 2. Plaintiff Barber

Defendant also challenges the typicality of Plaintiff Barber. Having already found Plaintiff Dean typical of the proposed class, the Court finds unnecessary further analysis of Plaintiff Barber's typicality. However, the Court finds Defendant's argument dubious, as it has provided no citations holding a plaintiff's previous participation in class action lawsuits renders her atypical.

### F. Adequacy

In determining whether a proposed class representative will adequately protect the interests of the class, the court should ask whether the proposed class representative and her counsel have any conflicts of interest with any class members and whether the proposed class representative and his counsel will prosecute the action vigorously on behalf of the class. Johnson v. General Mills, Inc., 275 F.R.D. 282, 288 (C.D. Cal. 2011).

### 1. Plaintiff Dean

Defendant argues Plaintiff Dean's credibility issues also preclude her from being an adequate representative of the proposed class. (Opposition at 12, citing Bohn v. Pharmative, LLC, 2013 WL 4517895, at *1 (C.D. Cal. Aug. 7, 2013) ("Plaintiff's credibility or integrity issues are relevant to her adequacy to the extent they concern issues directly relevant to the litigation or involve confirmed examples of dishonesty") (quotations omitted).) Additionally, Defendant contends Plaintiff Dean previously made false statements under oath during bankruptcy proceedings, and also falsely stated she had never been a party to another lawsuit. (Opposition at 13–14.)

As discussed above, the Court will not penalize Plaintiff Dean for her conflicting statements. Defendant attaches a level of dishonesty to Plaintiff Dean's statements which the Court is not comfortable adopting. As for Plaintiff Dean's statements concerning past litigation, Plaintiffs argue Dean relied on legal counsel for her bankruptcy litigation. (Reply at 6.) That

legal counsel was, unbeknownst to Plaintiff Dean, facing disciplinary action and has since been disbarred. (Dkt. No. 117-2, Exh. A.) Plaintiffs argue Plaintiff Dean and the proposed class should not be punished for the failure of Plaintiff Dean's bankruptcy counsel. (Reply at 6.) As for Plaintiff Dean falsely stating she was never the party of another lawsuit, this issue seems to be about semantics as to what qualifies as a lawsuit, and Plaintiffs submit evidence that Plaintiff Dean took no affirmatively deceptive steps. ("Dean Reply Declaration," Dkt. No. 117-3 ¶¶ 12–14.) Defendants raise questions regarding Plaintiff Dean's credibility. However, the Court cannot find, on this record and at this time, that Plaintiff Dean's inconsistent positions involve confirmed examples of dishonesty sufficient to defeat adequacy.

### 2. Plaintiff Barber

Defendant also challenges the adequacy of Plaintiff Barber. Having already found Plaintiff Dean to be adequate, the Court finds unnecessary further analysis of Plaintiff Barber's adequacy. Here again, however, Defendant's argument appears to be insufficient. Defendant challenges when exactly Plaintiff Barber started using Defendant's products, her participation in prior class actions, and an allegedly false statement she made under oath in 2009. The Court is not persuaded by these arguments.

### G. Superiority

Rule 23(b) requires issues common to the whole class to predominate over individual issues and also requires that a class action be a superior method of adjudication for the controversy. See Fed. R. Civ. P. 23(b)(3).

### 1. Damages

Plaintiffs "must be able to show that their damages stemmed from the defendant's actions that created the legal liability." Leyva v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013). Damages must be "feasibly and efficiently calculated once the common liability questions are adjudicated." (Id.) "A model purporting to serve as evidence of damages . . . must measure only those damages attributable to that theory." Comcast Corp. v. Behrend, 569 U.S. 27, 35 (2013). Here, "Plaintiffs assert that Optic White purchasers paid a premium based on Colgate's misrepresentation that Optic White 'Deeply Whiten(s)' teeth. . . . Accordingly, they assert that each member of the class is entitled to a reimbursement of the price premium attributable to Colgate's deep whitening claims." (Motion at 8.)

As evidence, Plaintiffs primarily attempt to use one of Defendant's own studies to demonstrate a link between the price premium on the toothpaste and the aggressiveness of the whitening claims. (Id. at 8–9.) Additionally, Plaintiffs present expert witnesses who conclude the aggressive whitening claims command a price premium. (Id. at 9–10.) Alternatively, Plaintiffs' experts state Plaintiffs could perform their own conjoint analysis to calculate the price premium attributable to the claims at issue. (Id. at 10.) Defendant counters by arguing "there was no price increase after the 'Deeply Whitens' claims were added." (Opposition at 20.)

Thus, there was no premium added at all; Plaintiffs are using a "hypothetical market" and measuring a "fictional premium." (Id.) Additionally, Defendant argues conjoint studies cannot be used to measure price premiums because they focus only on a consumer's subjective valuation of products and do not account for market realities. (Id. at 21, citing In re NJOY, Inc. Consumer Class Action Litig., No. CV 14-428-JFW (JEMX), 2016 WL 787415, at *6–7 (C.D. Cal. Feb. 2, 2016); Saavedra v. Eli Lilly & Co., No. 2:12-CV-9366-SVW, 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014).)

Plaintiffs present their own authority which states conjoint analysis is appropriate. (Motion at 10–11, citing Guido v. L'Oreal, USA, Inc., No. 2:11-CV-01067-CAS, 2014 WL 6603730, at *13 (C.D. Cal. July 24, 2014); Zakaria v. Gerber Prod. Co., No. LACV1500200JAKEX, 2016 WL 6662723, at *16 (C.D. Cal. Mar. 23, 2016).) Plaintiffs' expert, Colin Weir, also proffered pointed criticisms of Defendant's disagreement with the use of conjoint analysis. (Reply at 9–10.) Mr. Weir notes that, in finding there was no price premium increase as a result of the whitening claims, Defense expert Dr. Peter Rossi made several critical errors. (Id.) First, Mr. Weir believes Dr. Rossi excluded data from the before-and-after analysis including competitor pricing, advertising, promotional activity, packaging, and product development, all of which are competitive forces Dr. Rossi has admitted can influence market prices. ("Weir Reply Declaration," Dkt. No. 117-4, ¶¶ 46–54.) Additionally, Mr. Weir states that Professor Rossi's analysis used an aggregate average of all Optic White products instead of monitoring the price of each product individually. Weir states that "[r]ather than measure the change in price of each Optic White product individually, Rossi aggregated all of the sales data in a convoluted manner to produce a single prince index covering 39 actually independent and individual Optic White Products. This aggregation masks the movements of price due to promotional activity, and can result in an apparent price decrease even if all of the Products' prices increase simply as a result in a change in the sales mix (volumes) of the individual Products." (Id. ¶¶ 55–59.) Mr. Weir further argues Dr. Rossi arbitrarily ran his analysis from a period of time beginning one year before the aggressive claims were added and ending one year after the claims were added. (Id. ¶¶ 60–65.) By using these start and end points, Dr. Rossi was able to show there was no increase in price. (Motion at 10.) However, when Mr. Weir ran the same analysis, but over the entire period for which Dr. Rossi had data, the analysis showed a positive price premium. (Weir Reply Declaration ¶¶ 60–65.) Additionally, running the analysis for individual products instead of an aggregate average also showed a positive price premium. (Id. ¶ 64.)

The Court finds Mr. Weir's critiques of Dr. Rossi's work persuasive, and further finds conjoint analysis potentially useful to calculate classwide damages in this case. Specifically concerning is Dr. Rossi's failure to include data points in his regression analysis which he admits impacts market pricing, as well as his decision to aggregate all of the products instead of examining them individually. Therefore, Plaintiffs met their burden under Comcast and have put forth an appropriate model for calculating damages.

### 2. Colgate's Return Policy

Defendant notes that Plaintiffs seek to prove a price premium which would be a fraction of Optic White's total cost, while Defendant offers a 100% refund for any customer who is not satisfied with their products. (Opposition at 28.) Further, Defendant states that all customers who complained about Optic White's whitening ability were offered a full refund or full value coupon which was not contingent on the return of the product or any proof of purchase. (Id.) This remedy is available to anyone who has ever purchased Optic White, not just those individuals who purchased products during the dates relevant to the class action. (Id.) Colgate states it has given refunds in 95% percent of its complaints, and when it didn't give out a refund it was because the consumer either refused one or did not include sufficient contact information to process a refund. ("Holder Declaration," Dkt. No. 111-41 ¶ 9.) An exceedingly small amount of consumers complained to Colgate about the whitening ability of Optic White. (Id.) Colgate cites to a previous order by this Court where the defendant had a full refund policy and the class sought only a portion of the purchase price. Turcios v. Carma Labs., Inc., 296 F.R.D. 638, 648 (C.D. Cal. 2014). There, the Court stated the class action made "little sense" as "where the class mechanism is unnecessary to afford the class members redress." Id. at 648–649 (citing In re Phenylpropanolamine (PPA) Prod. Liab. Litig., 214 F.R.D. 614, 622 (W.D. Wash. 2003).

In response, Plaintiffs argue Defendant does not inform consumers of the availability of the refund policy on Optic White's packaging, but the policy is only accessible after clicking links on Defendant's website. (Reply at 13.) Consequently, Plaintiffs distinguish this case from Turcios, as there was no mention that defendant failed to inform consumers of the money-back guarantee in that case. (Id. at 14.)

This is a close issue, but the Court finds Plaintiffs' argument persuasive. The Ninth Circuit has not yet provided guidance on this issue. The Seventh Circuit has recently narrowed the term "adjudication," holding the definition does not include non-legal forms of adjudication such as a recall campaign, or presumably, a money-back guarantee. See In re Aqua Dots Prod. Liab. Litig., 654 F.3d 748, 752 (7th Cir. 2011). While this Court will not presumptively decline to consider refund policies when determining the superiority of the class-action remedy, it finds the refund policy must be known to the public to be effective. In In re Phenylpropanolamine, the court noted the "fact that consumers have not sought refunds in large numbers may well demonstrate that certification of the proposed class would merely serve to create lawsuits where none previously existed." 214 F.R.D. at 622. There, consumers had to actively seek out the refund policy or learn about it on a website. Id. However, the court noted the "possible availability of refunds likely occurred to a number of people" after the FDA widely publicized the withdrawal of drugs containing PPA. Id. Here, there is neither withdrawal nor chastisement from an administrative agency. The fact that an exceedingly small number of people have taken advantage of Defendant's policy could be a sign Plaintiffs are making a lawsuit where none previously existed, or it could be evidence of the lack of publicity surrounding the policy. Facing facts similar to these, the court in Webb v. Carter's Inc., 272 F.R.D. 489 stated "the relatively small number of returns most likely indicates that the majority of consumers are satisfied with the garments they bought." Id. at 505. This Court respectfully disagrees with the Webb court. The

Case 5:15-cv-00107-JGB-RAO Document 127 Filed 03/08/18 Page 14 of 16 Page ID #:6498

lack of publicity surrounding the policy taints the numbers Defendant provided regarding how many people have utilized it. As a consequence, the Court is unwilling to find Defendant's refund policy to be a superior form of adjudication.

### 3. Applicability of California Law

Defendant contends a ten-state class cannot be certified because California law cannot be applied nationwide. (Opposition at 25.) To apply California law on a classwide basis, Plaintiffs must show "California has significant contact or significant aggregation of contacts to the claims of each class member." Mazza v. Am. Honda Motor Co., 666 F.3d 581, 589 (9th Cir. 2012). If Plaintiffs make this showing, then Defendant must demonstrate that foreign law, rather than California law, should apply because the interests of those states outweigh the interests of California. Id. In weighing the states' interests, the Court applies California's three-part choice-of-law analysis: (1) whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different; (2) if there is a difference, examine whether each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists; and (3) if there is a true conflict, evaluate and compare the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were not applied, and then apply the law of the state whose interest would be more impaired. Id.

Here, Defendant argues Plaintiffs have not shown California has significant contact or significant aggregation of contacts to the claims of each class member. (Opposition at 25–26.) Plaintiffs, attempting to meet that burden, argue that in Mazza, the Ninth Circuit found sufficient contacts with California because 20% of the proposed class members were located in California. (Reply at 11, citing Mazza, 666 F.3d at 590.) Plaintiffs estimate 46% of the members of this class are located in California. (Reply at 11.) Additionally, Plaintiffs note the studies commissioned by Colgate to support the "deeply whitens" claim were conducted in California. (Id.) These facts, however, are insufficient to meet the Mazza requirements. Plaintiffs correctly state that the Mazza court used the location of the class members to justify class certification. However, the location of the class members was not dispositive. In full context, the Mazza Court found that California "has a constitutionally sufficient aggregation of contacts . . . because Honda's corporate headquarters, the advertising agency that produced the allegedly fraudulent misrepresentations, and one fifth of the proposed class members are located in California." Mazza, 666 F.3d at 590. The location of the defendant's corporate headquarters or principal place of business is much more dispositive of the "significant aggregation of contacts" analysis than the location of the class members. See, e.g., In re Yahoo Mail Litig., 308 F.R.D. 577, 602 (N.D. Cal. 2015) (finding that California has a significant aggregation of contacts because Yahoo's corporate headquarters were in California and the vast majority of Yahoo's executive decision makers were located in California); Galvan v. KDI Distribution Inc., No. SACV 08-0999-JVS ANX, 2011 WL 5116585, at *14 (C.D. Cal. Oct. 25, 2011) (finding that California has a significant aggregation of contacts because the defendant was based there and conducts the majority of its business in California); Chavez v. Blue Sky Nat. Beverage Co., 268 F.R.D. 365, 379

Page 14 of 16    CIVIL MINUTES—GENERAL    Initials of Deputy Clerk MG

(N.D. Cal. 2010) (finding that California has a significant aggregation of contacts because Defendants are headquarted in California and their misconduct allegedly originated in California).

In this case, Defendant is a Delaware corporation with its principal place of business in New York.  (Opposition at 26.)  Plaintiffs only argument for significant aggregation of California contacts lies in the location of class members and the fact that Defendant conducted some studies in California.  (Reply at 11.)  This is insufficient.  Thus, Plaintiffs have not met their burden showing that California law can apply to a multi-state class.  Accordingly, the Court cannot certify the proposed class as presently defined.

### IV.   REVISING THE CLASS DEFINITION

Having declined to certify Plaintiff's proposed ten-state jurisdictional class, the Court now examines whether it has the authority to certify a California-only class.  During the hearing held on January 29, 2018, the Court asked the parties to file concurrent briefing on this subject, due on February 2, 2018.  Both parties complied.  (See "Plaintiffs Supplemental Brief," Dkt. No. 122; "Defendant's Supplemental Brief," Dkt. No. 123.)  In this case, Plaintiffs did not alternatively propose a California-only class.  This point is critical, as Plaintiff's Supplemental Brief provides ample authority for the proposition that courts have the authority to revise a class definition, but the cited authority showed only that a California-only class can be certified when alternatively proposed.  (See Plaintiff's Supplemental Brief at 2–3 (citing Wolf v. Hewlett Packard Co., 2016 WL 7743692, at *15 (C.D. Cal. Sep. 1, 2016); Werdebaugh v. Blue Diamond Growers, 2014 WL 2191901, at *21 (N.D. Cal. May 23, 2014); Racies v. Quincy Bioscience, LLC, 2017 WL 6418910, at *5–*6 (N.D. Cal. Dec. 15, 2017); Ono v. Head Racquet Sports USA, Inc., 2016 WL 6647949, at *3, fn. 6 (C.D. Cal. Mar. 8, 2016).)  Notably, all of these cases are distinguishable, as they all included some form of proposed California-only class in the alternative.  Defendant rightly points out that courts have often declined to *sua sponte* revise geographic class boundaries.  (See Defendant's Supplemental Brief at 1 (citing Karim v. Hewlett-Packard Co., 2014 WL 555934, at *8 (N.D. Cal. Feb. 10, 2014) (declining to *sua sponte* certify a California-only class because neither party addressed the alternative in the class certification motion").)  Defendants argue they were unprepared to argue against a California-only class as it was never mentioned in Plaintiffs' briefing, and Plaintiffs have not affirmatively established that Rule 23 is satisfied with respect to a California-only class.  Crucially, Defendant has not put forward any authority showing the Court cannot *sua sponte* geographically revise a class definition, but only that some courts have chosen not to.  Upon examination of the parties submitted authorities, the Court declines to *sua sponte* certify a California-only class.  If Plaintiffs wanted the Court to consider this option, it should have been fully briefed in their Motion, giving Defendant a chance to respond.  As Plaintiffs have failed to seek, in the alternative, a California-only class, their Motion must be denied.

### V.   CONCLUSION

For the reasons stated above, the Court DENIES Plaintiffs' Motion to Certify Class.  (Dkt. No. 102.)  Additionally, the Court GRANTS IN PART and DENIES IN PART

Defendant's Application 1 (Dkt. No. 110); GRANTS Plaintiffs' Application (Dkt. No. 116); and (4) DENIES Defendant's Application 2 as moot (Dkt. No. 71).

    **IT IS SO ORDERED.**